**United States District Court**
**District of Massachusetts**

```
─────────────────────────────────
                                  )
JOHN DOE,                         )
                                  )
          Plaintiff,              )
                                  )
          v.                      )     Civil Action No.
                                  )     16-10458-NMG
BETH DEVONSHIRE, PETER            )
WIERNICKI, ED CABELLON and        )
BETH MORIARITY,                   )
                                  )
          Defendants.             )
                                  )
─────────────────────────────────
```

<u>**MEMORANDUM & ORDER**</u>

**GORTON, J.**

This case arises out of allegations by a disabled undergraduate student that school administrators unlawfully suspended him from on-campus housing for one year after his roommate accused him of engaging in lewd conduct in his room.

Pending before the Court is plaintiff's motion for a preliminary injunction. For the reasons that follow, that motion will be denied.

## I.  <u>Background</u>

### A.  **The parties**

Plaintiff John Doe ("Doe" or "plaintiff") is a full-time, freshman student at Bridgewater State University ("BSU"). He has been diagnosed with "severe" emotional and learning disabilities including generalized anxiety disorder,

-1-

sensorineural hearing loss, disorder of written expression and attention deficit hyperactivity disorder ("ADHD").

Defendant Beth Devonshire ("Devonshire") is the Director of the Office of Community Standards ("Director") at BSU who suspended plaintiff's on-campus housing privileges for the 2016 calendar year.

Defendant Peter Wiernicki ("Wiernicki") is the Associate Director of the Office of Community Standards at BSU who investigated the charge that plaintiff engaged in lewd conduct.

Defendant Ed Cabellon ("Cabellon") is the Appeals Officer at BSU who reviewed plaintiff's appeal from the housing sanctions imposed by Devonshire.

Defendant Beth Moriarty ("Moriarty") is the Director of Residence Life and Housing at BSU.

**B.   The Student Code of Conduct**

The BSU Student Code of Conduct ("the Student Code") sets forth the responsibilities of all members of the BSU community. Section B(16) of Part III proscribes

> [c]onduct that is lewd or indecent such as public urination, public defecation, streaking, stripping, or solicitation of a stripper.

Violations of the Student Code are adjudicated pursuant to the Community Standards Procedures.  Section A(3) of Part IV instructs the Director of Community Standards to assign an investigator to the case and schedule a conference with the

-2-

subject of the investigation.  Section B(1) of Part IV requires the investigator to hold an Administrative Conference with the subject to review the incident, discuss the disciplinary process and explore possible options for resolution.

If the parties are unable to resolve the dispute, the investigator is called upon to conduct a full investigation pursuant to section C(1) of Part IV and to submit his or her findings, determination of responsibility and recommended sanctions to the Director.  If the investigator finds the subject responsible, he or she is to request the subject to submit a community impact statement and notify him or her of the Administrative Review.  The investigator is to send his or her report to the Administrative Review Committee and, if approved, to the Director.  The subject is then given written notification of the findings and sanctions.

Section C(3) of Part IV entitles the subject to the following rights during the disciplinary process: 1) to be notified of the allegations against him, 2) to review any written complaints, 3) to be informed about the Community Standards process, 4) to submit a written account or personal statement, 5) to present relevant information, 6) to be accompanied by an advisor during a Community Standards meeting, 7) to receive, upon written request, a copy of the investigatory

report at the conclusion of the proceedings and 8) to present a
personal or community impact statement on sanctions.

### C.    The alleged conduct

In the summer of 2015, plaintiff enrolled at BSU as a full-
time, first-year student, registered with the BSU Disability
Resources Center and submitted a complete copy of his disability
history to the school.  BSU assigned Pamela Spillane
("Spillane"), a Learning Disability Specialist, to consult
regularly with him and ensure that he received the appropriate
disability accommodations.

Plaintiff entered into a Residence Hall Licensing Agreement
("the Housing Agreement") with BSU that provided him with on-
campus housing for the entire 2015-2016 academic year.  The
Housing Agreement provided that BSU could terminate the contract
for good cause.  BSU initially assigned him to a dormitory room
in the residence hall with two roommates.

Plaintiff had not lived away from home before and had
trouble adjusting to life on campus.  In early September, 2015,
he told his roommates and school administrators that his former
girlfriend had committed suicide, her father had been murdered
and he himself had previously attempted suicide.  BSU notified
campus police who took him to a hospital for a voluntary
psychological evaluation.  He admitted that he lied about those

events because he was upset that another female student had
rejected his advances.

In late September, 2015, plaintiff, while tossing a small
ball around his dormitory room, hit one of his roommates with
the ball which led to an argument.  The argument escalated until
the roommate pushed him into a desk and reported him to BSU
administrators for violating the Student Code.

Plaintiff was charged with engaging in endangering
behavior, harming behavior and disruptive behavior.  Assistant
Director Wiernicki investigated the incident, notified plaintiff
of the charges, interviewed him at an administrative conference
and ultimately found that he did not engage in endangering or
harming behavior.  Plaintiff and Wiernicki agreed, however, that
he was responsible for engaging in disruptive behavior.  There
was no liaison from the Disability Resources Center present
during the proceedings.

BSU directed plaintiff to attend an anger management
evaluation and complete 20 hours of community service.  BSU also
placed him on probation and cautioned him that, due to his
history of misconduct, he could be suspended or expelled from
BSU if he violated the Student Code again.  BSU reassigned
plaintiff to a smaller dormitory room with two new roommates,
which Wiernicki and Spillane concluded would be a suitable
accommodation for someone with his disabilities.

-5-

Shortly thereafter, plaintiff's new roommates complained to the resident assistant that he was creating unhygienic living conditions, making sexual comments about women, making violent verbal remarks and swearing excessively.  The resident director met with plaintiff, reminded him of the resources available on campus and warned him that any further violation of his terms of probation could subject him to removal from the residence hall.

In early October, 2015, BSU opened a Title IX investigation against him based upon allegations by a female student that he had sexually harassed her.  The female student claimed that he had made statements objectifying women and repeatedly touched her despite being told not to do so.

In November, 2015, one roommate reported to the resident director that he had seen him masturbate in his bed and clean himself afterward with a shirt from the floor.  The roommate provided a copy of a Yik Yak social media post in which an anonymous author wrote that his or her roommate's presence in the room made it difficult for the author to masturbate.  An anonymous reply, which plaintiff later admitted authoring, to the initial post stated, "[A]ssert your dominance: jerk it while he's still in the room."

BSU opened a new investigation and again assigned Wiernicki to the case.  Wiernicki sent him a letter on November 30, 2015 informing him that he was being investigated for a potential

-6-

violation of the Student Code.  The letter instructed him that
there would be a conference to discuss the incident, explain the
disciplinary process and determine whether to launch a full
investigation.

Wiernicki sent him two more letters on December 2 and 7,
2015, confirming that BSU was fully investigating whether he had
engaged in lewd conduct in violation of the Student Code.  The
letters identified the potential witnesses and invited him to
participate in the process by reviewing the complaint or
submitting a personal statement or other relevant information.
The letters explained that 1) he would have an opportunity
afterward to discuss Wiernicki's report and submit a community
impact statement, 2) an independent committee would review the
report, assess whether plaintiff engaged in lewd conduct and
impose sanctions if warranted and 3) he would receive a copy of
the formal findings and be able to appeal the decision.  The
letters also referred him to a copy of the BSU Student Handbook
and Student Code.

Wiernicki then conducted his investigation.  He interviewed
the reporting roommate, who admitted that he had not actually
seen the masturbation because it occurred under the covers, and
the other roommate, who had not noticed the incident at all.
Wiernicki interviewed plaintiff twice and reviewed the following
records: an incident report, multiple sets of meeting notes,

-7-

materials submitted by the reporting roommate, copies of the
social media posts, plaintiff's drawing of his dormitory room, a
signed statement by the reporting roommate and a personal
statement from plaintiff who "vehemently denied" the charges.

Meanwhile, in early December, 2015, plaintiff informed a
resident assistant that he was scared and anxious about the
ongoing litigation and concerned that other students would view
him as an "active shooter threat."  Plaintiff's psychologist
would later characterize his statements as "gross exaggerations"
and an example of his inability to ask properly for help with
handling his emotions.

On December 10, 2015, Wiernicki found that

> it was more likely than not that Plaintiff masturbated
> in his bed in front of his roommate and authored the Yik
> Yak post discussing what he had done.

Wiernicki recommended that he be held responsible for engaging
in lewd conduct and suspended from the residence hall.

On January 8, 2016, the Administrative Review Committee
adopted those findings and recommendations and "banned Plaintiff
from living in the residence halls until the end of 2016."
Devonshire sent him a letter informing him of the findings, the
sanctions and his right to appeal.  The letter again referred
plaintiff to the BSU Student Handbook and Student Code.

Plaintiff appealed the sanction and submitted a community
impact statement and a letter from his mother.  Appeals Officer

-8-

Ed Cabellon informed him in March, 2016 that he had denied the appeal and upheld the temporary suspension.

### D.    Procedural history

On March 3, 2016, plaintiff initiated this action against Devonshire, Wiernicki, Cabellon and Moriarty (collectively, "defendants") in their official and personal capacities.  He alleged that they 1) violated his procedural due process rights, pursuant to 42 U.S.C. § 1983, by disciplining him without notice and an opportunity to be heard, 2) interfered with his substantive due process rights, pursuant to § 1983, by basing their disciplinary findings upon an unreasonable interpretation of the Student Code of Conduct and imposing arbitrary sanctions and 3) breached the Housing Agreement which entitled him to housing for the full academic year.

Plaintiff also filed the instant motion for a preliminary injunction.  Another session of this Court held an initial motion hearing in mid-March, 2016 and directed defendants to accommodate plaintiff in a one-person room in the residence hall while the motion remained pending.  This session of the Court held a second hearing in early April, 2016.

## II.  Plaintiff's motion for a preliminary injunction

### A.    Legal standard

In order to obtain a preliminary injunction, the moving party must establish 1) a reasonable likelihood of success on

the merits, 2) the potential for irreparable harm if the injunction is withheld, 3) a favorable balance of hardships and 4) the effect on the public interest. Jean v. Mass. State Police, 492 F.3d 24, 26-27 (1st Cir. 2007); Largess v. Supreme Judicial Ct., 317 F. Supp. 2d 77, 81 (D. Mass. 2004); Quincy Cablesys., Inc. v. Sully's Bar, Inc., 640 F. Supp. 1159, 1160 (D. Mass. 1986).  Of these factors, the likelihood of success on the merits "normally weighs heaviest on the decisional scales." Coquico, Inc. v. Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009).

The Court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits." Rohm & Haas Elec. Materials, LLC v. Elec. Circuits, 759 F. Supp. 2d 110, 114, n.2 (D. Mass. 2010) (quoting Elrod v. Burns, 427 U.S. 347, 350, n.1 (1976).  The Court may also rely on otherwise inadmissible evidence, including hearsay. See Asseo v. Pan Am. Grain Co., Inc., 805 F.2d 23, 26 (1st Cir. 1986).  Ultimately, the issuance of preliminary injunctive relief is "an extraordinary and drastic remedy that is never awarded as of right." Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011)).

**B.   Application**

Plaintiff seeks to enjoin defendants to lift his housing suspension, to allow him to remain in student housing and to comply with the terms of the Housing Agreement.

**1.   Likelihood of success**

**a.   Count 1: Procedural due process**

Procedural due process protects an individual from deprivations of protected interests that are unfair. Licari v. Ferruzzi, 22 F.3d 344, 347 (1st Cir. 1994).  A plaintiff with a procedural due process claim must (1) identify a protected liberty or property interest and (2) allege that the defendants deprived him of that interest without constitutionally adequate process. Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 13 (1st Cir. 2011).

**i.   Protected interest**

The Due Process Clause protects a student's property interest in pursuing a public education. Goss v. Lopez, 419 U.S. 565, 574 (1975).

Plaintiff asserts that, although the housing sanction does not expressly preclude him from receiving an education at BSU, "a suspension from student housing is tantamount to a suspension from BSU" for him because 1) his mother's house is two hours away by commuter rail and he cannot, in light of his disabilities, commute four hours each day while staying on top

-11-

of his schoolwork and 2) he cannot live in off-campus housing
because he is not emotionally, psychologically or financially
prepared to live alone and without the support that BSU offers
to disabled students on campus.

The Court finds that plaintiff likely cannot establish a
protected property interest in living in the residence hall at
BSU.  Plaintiff cites no authority for the proposition that the
protected right to a public education includes the right to
participate in a specific housing program at school.  Although
the Court recognizes and is sympathetic to the difficulties that
plaintiff may face in living in off-campus housing, whether near
BSU or at his mother's house, it declines to expand the
protected right to education to include the right to live in on-
campus housing.

Alternatively, plaintiff contends that the suspension from
on-campus housing injures his protected liberty interest in his
reputation.  He explains that a public finding that he violated
the Student Code by engaging in lewd conduct would likely reduce
his ability to transfer to another school and may restrict his
future employment opportunities.  Defendants respond that 1) a
suspension from student housing, unlike an "outright suspension"
from school, carries no demonstrated stigma, 2) plaintiff offers
no evidence that other educational institutions or future
employers would inquire into his housing record and 3) any harm

-12-

to his reputation would be a result of his own behavior rather than the housing suspension itself.

The United States Supreme Court has recognized that a student has a protected liberty interest in his reputation and the possibility that school disciplinary charges, if sustained and recorded, could "seriously damage" his standing with his peers and teachers and later interfere with his prospects for higher education and employment. <u>Goss</u>, 419 U.S. at 574-75.

Accordingly, the Court finds that in this case, which involves disciplinary findings of lewd conduct, plaintiff is likely to establish a protected liberty interest in maintaining his reputation.

### ii.  Adequate process

Constitutionally adequate process in the context of school disciplinary proceedings requires that the affected student receive notice and an opportunity to be heard before his expulsion or significant suspension from a public school. <u>Gorman</u> v. <u>Univ. of Rhode Island</u>, 837 F.2d 7, 12-13 (1st Cir. 1988). The proper inquiry is whether the hearing was fair under the particular circumstances, not whether the hearing was ideal or whether its procedure could have been improved. <u>Gorman</u>, 837 F.2d at 16.  Adequate process requires

> not an elaborate hearing before a neutral party, but
> simply an informal give-and-take between student and

disciplinarian which gives the student an opportunity to
explain his version of the facts.

Id. (internal quotation marks omitted).

Plaintiff claims that defendants violated his procedural
due process rights when they did not affirmatively offer or
provide a disability accommodation during the proceedings, even
though they knew that he could not participate meaningfully in
his defense on his own.  He submits that his disabilities
prevented him from understanding the charges, processing the
information at the meeting, fully understanding his rights,
requesting an attorney, reviewing the evidence and defending
himself against the charges.  He proclaims that he was unable to
recognize that he needed assistance and suggests that he "wanted
to be finished with the process to relieve his anxiety."

He also submits that he was entitled to argue his case
before an impartial tribunal rather than before Wiernicki who
"likely viewed [him] as a problematic roommate" based upon his
knowledge of plaintiff's disciplinary record.  He submits that
he was also entitled, pursuant to the First Circuit's decision
in Goss, 419 U.S. at 581, to receive copies of all witness
statements in advance of any interview or hearing with a school
administrator.

The Court notes that plaintiff's reliance on the Goss
decision is misplaced because 1) that decision was expressly

-14-

confined to short-term suspensions which differs from the
sanction in this case, and 2) the Goss court required the school
to provide an "explanation of the evidence the authorities have
and an opportunity to present his side of the story," id. at
581, 584, not copies of the evidence itself.

Defendants deny that they provided inadequate process and
point out that they 1) warned plaintiff that further misconduct
would violate his probation and subject him to additional
discipline, 2) sent him several letters notifying him of the
charges, outlining the disciplinary process and notifying him of
the witnesses and evidence, 3) provided him a copy of the BSU
Student Handbook which sets forth the disciplinary procedures
and explains his rights, 4) allowed his attorney and mother to
participate, 5) furnished information on "how best to write an
impact statement (and considered this personal statement)",
6) appointed two Administrative Review officers to determine
whether he engaged in lewd conduct and impose sanctions,
7) notified him of the findings, the sanction and his right to
appeal, 8) permitted him to submit an appeal and supplementary
information and 9) appointed an independent administrator to
adjudicate the appeal.

The Court agrees with defendants and finds that plaintiff
received sufficient process because he had notice of the charge
of lewd conduct and communications with a school administrator

that afforded him an "opportunity to explain his version of the facts." Gorman, 837 F.2d at 16.  Although defendants were not required to provide him "an elaborate hearing before a neutral party," see id., they nevertheless appointed independent officers to review his case and appeal.  His complaints that defendants should have affirmatively offered him disability accommodations, rather than merely referring him to instructions on how to request such accommodations, amount to claims that the hearing could have been more fair and the procedures more ideal. The proper inquiry here, however, is whether plaintiff received constitutionally sufficient process, and the Court concludes that he did.

Accordingly, plaintiff has not, at this preliminary stage, shown a likelihood of success on his procedural due process claim.

### b.  Count 2: Substantive due process

Substantive due process protects against arbitrary and capricious deprivations of protected interests. Licari, 22 F.3d at 347.  To prevail on a substantive due process claim, a plaintiff must allege that the defendants' actions were "so egregious as to shock the conscience." Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 639 (1st Cir. 2013).

To shock the conscience, the conduct must be "truly outrageous, uncivilized, and intolerable." Hasenfus v.

LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999).  In a case involving school discipline, a substantive due process claim "will succeed only in the 'rare case' when there is no rational relationship between the punishment and the offense." Demers ex rel. Demers v. Leominster School Dep't, 263 F. Supp. 2d 195, 206 (D. Mass. 2003).

Plaintiff contends that defendants violated his substantive due process rights because his housing suspension is not rationally related to his act of "masturbating in the privacy of his own dormitory room, at night, under his bedsheets".  He characterizes his conduct as "behavior that is widely understood to be prevalent among college students".  He claims that his suspension was arbitrarily and capriciously imposed because defendants had never disciplined another student for that behavior in the past.  He argues that his actions did not implicate defendants' interest in campus safety because he was not a security threat and, in fact, was trustworthy enough to work as a student security officer at BSU.

Defendants respond that the temporary suspension from on-campus housing was reasonable and does not shock the conscience in light of 1) his lewd conduct which they describe as "committing a sex act in the presence of his roommates", 2) his history of aggressive and harassing behavior in the residence

-17-

hall and 3) the "current 'apprehensive climate' that exists due to publicized incidents of school violence and sexual violence".

Plaintiff faces a high burden of demonstrating that defendants' actions shocked the conscience. The Court finds that he is unlikely to meet that burden here because defendants likely did not act "truly outrageous[ly]" or irrationally in temporarily suspending him from on-campus housing in response to their finding that he engaged in lewd conduct in the residence hall. Accordingly, plaintiff is unlikely to succeed on his substantive due process claim.

### c.    Count 3: Breach of contract

A plaintiff alleging a breach of contract must demonstrate 1) the existence of a contract, 2) his performance or willingness to perform under the contract, 3) breach by the defendant and 4) if he seeks damages, causation and the amount of damages. Amicas, Inc. v. GMG Health Sys., Ltd., 676 F.3d 227, 231 (1st Cir. 2012).

Plaintiff alleges that defendants breached the contract terms of the Housing Agreement, which entitled him to on-campus housing for the full academic year, by terminating his housing privileges, without good cause, after improperly finding that he engaged in lewd conduct. He also submits that their violations of his procedural and substantive due process rights, detailed

above, breached the implied covenant of good faith and fair dealing in the contract.

Defendants deny that they breached the Housing Agreement and maintain that they properly concluded that he violated the Student Code by engaging in lewd conduct. They argue that, in any event, they cannot be liable under the contract because they themselves are not parties to the Housing Agreement between plaintiff and BSU. They also note that he cannot raise a contract claim against BSU, a state entity, in federal court because that claim is barred by the Eleventh Amendment.

Plaintiff appears to base his contract claim entirely upon his argument that defendants acted unlawfully in concluding that he engaged in lewd conduct. As discussed above, however, plaintiff is unlikely to demonstrate that they acted irrationally or unconstitutionally in finding that he engaged in lewd conduct or temporarily suspending him from on-campus housing. His contract claim, even if properly lodged against these defendants, is thus unlikely to succeed on the merits.

Accordingly, plaintiff is not entitled to injunctive relief because "[l]ikelihood of success on the merits is the critical factor in the analysis." Sankey v. Aurora Loan Servs., LLC, 757 F. Supp. 2d 57, 59 (D. Mass. 2010). See also Tuxworth v. Froehlke, 449 F.2d 763, 764 (1st Cir. 1971)("No preliminary injunction should be granted in any case unless there appears to

be a reasonable possibility of success on the merits."); <u>Weaver</u> v. <u>Henderson</u>, 984 F.2d 11, 12 (1st Cir. 1993)("In the ordinary course, plaintiffs who are unable to convince the trial court that they will probably succeed on the merits will not obtain interim injunctive relief."). Plaintiff's motion for injunctive relief will be denied.

**<u>ORDER</u>**

For the foregoing reasons, plaintiff's motion for a preliminary injunction (Docket No. 6) is **DENIED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated April 15, 2016